The case for argument is O. v. Anthem Blue Cross Insurance. Good morning. May it please the Court, the Counsel, Brian King is my name. I'm honored to be able to represent Tracy and Dante O. this morning. On July 2, 2013, S. O., the daughter of Tracy and Dante, was admitted to New Haven Residential Treatment Center. Counsel, you're very soft spoken and I appreciate that, but I don't hear quite as well as you do. All right. I will work harder to make myself heard. I think that's rather important, Your Honor, so thank you. Otherwise this activity is sort of pointless. Yes, I appreciate that. Thank you. On July 2, 2013, S. O. was admitted to New Haven Residential Treatment Center. At that time, she was suffering from a variety of mental illnesses. She had been diagnosed with a variety of diagnoses. She was clearly psychotic, in the opinion of Dr. Woodall, her psychiatrist. And her therapist, in the time frame immediately before she was admitted to New Haven, had said to Tracy and Dante, I don't want you to leave this young woman unsupervised. She, Ms. Maskin, the therapist, was very concerned, as was Dr. Woodall, about her welfare. And that had been true for months. They were concerned about S. O., they were concerned that she would commit suicide, and they had recommended residential treatment for quite a while. Tracy and Dante were reluctant to do that, because it would mean sending S. O. away from home. She was a young woman. They were very worried. But the day treatment program at BHC Alhambra Hospital in March and April had not resulted in stabilization and progress for S. O. in a way that those treating physicians felt was necessary in order for her to not be in a residential treatment setting. Counsel, I've got a question. Was S. O. treated on an outpatient basis prior to her admission to New Haven? Yes. And that didn't work? That's right. So you had a period of time, Judge Baldock, when she was treated at BHC Alhambra at an acute level for a short period of time in March and April of 2013. And then there was a period of time where there was outpatient treatment after that, but before July. And S. O. continued to have these variety of problems, eating disorders, binging, purging, withholding from eating completely. She was self-harming. She was cutting. It's a harrowing record, quite honestly, to read. And the family, I actually talked with Dante last night about how S. O. is doing, because I wanted to have that sense of that in coming to you, because this is ‑‑ Certainly, and I appreciate that, Judge Briscoe, and I won't do that. The first issue in the case that I think is important is this question about the standard of review. We indicated in our briefing that discretionary authority clauses have been described by the National Association of Insurance Commissioners as inequitable, deceptive, and misleading to consumers. This Court should cut no slack to Anthem in allowing them to obtain a deferential standard of review unless and until the language in that document that they're providing to people is clear in providing notice that the review will be under a deferential standard of review. Do we have the plan? I don't believe so. And why don't we? I don't know. Anthem is the one who has that document. Did you ask them for it? I don't remember whether in the pre-litigation appeal process we specifically asked them for that. It seems important in this case. I don't understand why we don't have the basic document. Quite honestly, I don't either, Your Honor. Well, isn't part of that your responsibility? No, I don't think so. Request for admission of documents? We can ask for a copy of documents, sure. And I can't respond to the summary judgment until I get documents? There's that rule, too? Well, you certainly need the governing plan documents. I think you'd have to ask them and see what they say, but what Anthem has told us is you've got everything we've got. So I think what may be going on here is that Anthem is saying we don't have anything other than what you have, but the document that we have says there's something else. So I think it's chips passing in the night on that, and I don't know how to resolve that. So what should we do? Remand? Have somebody somewhere, including the both of you, to get the documents together so we really know what's going on? I don't think remand would be helpful. I think that you should take the language of the documents in front of you and determine from those documents and the language in those documents what the standard of review is. And that's what we've asked the Court to do, and our position is that the language in that SPD, the summary plan description, strictly speaking based on the Nance case, this is the 2002 case and McGraw before that was in 1998, the Tenth Circuit said, you know, this language is borderline. We're going to let it go for now. But as I noted in the briefing, in footnote three of Nance, the panel in Nance, this Court said, we're going to revisit this in the future, and we're not necessarily going to cut the slack that you're getting in this case, but we're going to review it and determine whether or not we can do it.  We'll do that in the case of the State Insurance Company in future cases. I would submit to you, Your Honors, that the time has come for the Tenth Circuit to tighten that up. Other circuits across the country have done so, and we've cited those cases, the Grosse case from the First Circuit, the Cozy case from the Fourth Circuit. Well, it wouldn't be much of a rule if we're tightening up based on a record that's incomplete. I understand. But the documents that you have in front of you, Your Honor, the language in them isn't sufficient under our – So it would be rather a case-specific ruling. Well, yes. I think it would be based on the language – It wouldn't be something that would go out to all mankind. Well, based on the language of these documents, it's insufficient. I think even if you did that, though, Judge Briscoe, in the context of the language that we agree is before the Court, if you tighten it up, that's going to be a movement in the direction that we're asking the Court to make a movement in, in terms of the Grosse and the Cozy cases, basically saying to insurance companies, look, stop being ambiguous about what the standard of review is here. These are important issues. And as Judge Posner said in the Hertzberger case, in the Seventh Circuit, people are entitled to know how solid their entitlement is to these benefits. Counsel, can you just tell us what you want the language to say? Well, I think the language that you find in the Firestone case is sufficient, which says the plan reserves discretionary authority to determine eligibility for benefits and to interpret the terms of the contract. That's fine. It has to specifically reference discretionary authority. And when you say, as this case does, Anthem determines what's medically necessary, well, Anthem always determines. I mean, that's the function of an insurance company is to make a decision about whether something's medically necessary or not. That gives no notice to the family that they're reserving discretionary authority in a way that when the family has an attorney like in this case come before you, you are going to say to me, I, we can't reverse this denial unless it's an abuse of discretion, unless it's arbitrary and capricious. Families are entitled to know that, and that's what I think Hertzberger and most of the other circuits are moving in that direction in that case. Counsel, I'm very bothered by the missing or lacking of documents, because I remember reading as I was preparing for this that, and I had a question, is there any other governing plan documents or not? And your answer today to the court was that they told you you have what they have, but then you're arguing that there may be another plan out there. So, well, for instance, looking at the names of the parties involved in here, we've got the cases that address, based on the documents, conflicts of interest. And, you know, and this goes to a way that we review, our standard of review. I'm a little perplexed in trying to arrive at, on the basis of what you say we have, as to a decision that would be justice to both sides in regards to what's being asked here. Well, I understand, Your Honor. It's a hard situation, Judge Baldock, because I think what we have is a plan document that says something quite definitive, namely, hey, there's something else out there more express and explicit and binding, when, in fact, from what Anthem tells us, that document, that plan document, at first, it doesn't exist. Well, I know it's a matter of trial practice and everything, but it just seems logical to me that you would have at least followed with the court saying, I demand that you produce so that you've got on record them saying, this is all there is. I mean, but that's a legal determination that the lawyer makes in the heat of a battle sometimes. I understand. And the problem was, what do you do with an inconsistent governing plan document? But we don't know that we have it. And that's what Anthem has told us, is that we have everything they have. Now, the second point I think that is critical in the case is that the evidence in the record shows that the Anthem denial was neither correct nor reasonable. We've outlined the information. The record is quite clear in telling you what the condition of Esso was, what the recommendations and prescriptions of care from her treating physician, Dr. Woodall, and her therapist, Ms. Maskin, was. And we believe that under these circumstances, it was simply arbitrary and capricious. It was certainly incorrect, if not arbitrary and capricious, for Anthem to ignore the undisputed facts in the medical record. And we've cited the case law for you on that, Black and Decker versus Nord. This court in Razanac and Fott and Gaylor said, it's an abuse of discretion to ignore undisputed facts. And what we have here is information that was provided by the individuals, Dr. Woodall and Ms. Maskin, who had the greatest knowledge of what was going on in Esso's life. I think that it's appropriate, and we've talked about this in the briefing, for this court to recognize, as it suggested in Razanac, was appropriate that the treating physician in these kinds of mental and emotional behavioral illness cases, they're in the best position to make a diagnosis, to come to conclusions, to provide findings to the record reviewers. Now, the Supreme Court in Black and Decker versus Nord is very clear in saying, look, there's no treating physician rule, and we don't argue otherwise. But we do think that when you're talking about undisputed information in the record, it's critical in this case for Anthem and its reviewers, and the external reviewer, Maximus, to take that information, unless they have a good reason to dispute it. I understand that the insurance company rejected the claim because the criteria that they were measuring this claim against was not met. They said that. You're right. You're right, Judge Briscoe. And those seem to be pretty objective standards. And for instance, that she was not suicidal when they issued their opinions, those doctors that looked at her after the claim was filed, and that she had not harmed herself recently, not a danger to herself or others. Those kinds of findings and determinations seem to be undisputed. No, I don't. Well, I don't agree with that. I think that when you look at Dr. Woodall and Ms. Maskin, they say that she was at risk and she was harming herself. But my point is more fundamental in this way. She had in the past, but at present, while in this care, she had not. And my point is this, Your Honor. When you're talking about those criteria, lack of suicidal ideation with a plan or intent or lack of active suicidal behavior, that's the wrong criteria. You simply don't find that language in the residential treatment criteria. The residential treatment criteria is much less definitive in terms of saying you've got to be an actively suicidal individual. It talks about manifesting symptoms and behavior which represent a deterioration from their usual status and include either self-injurious or risk-taking behaviors that risk serious harm and cannot be managed. Words have meaning. This is a very critical continuum that we're dealing with in terms of the severity of care. And what I see over and over again is insurers wanting to impose on residential treatment acute inpatient criteria such as are you actively homicidal, are you actively suicidal. That is inappropriate. Okay. We have in our record, I'm afraid to ask this, a listing of both of those criteria, the criteria they used and the criteria you believe they should have used. Well, the criteria that should have been used you find at, let me see if I can get the record signed, 2206 is the criteria that they should have used, the residential treatment center criteria. And the criteria, I don't know that the record contains a copy of the criteria that was used for acute inpatient treatment. Okay. Thank you. So if we just simply look at that criteria that you've identified, the residential criteria, and we look at the findings and conclusions made by their doctors, you would see that they do not match up. Exactly. Okay. Thank you. Good morning. May it please the Court. I am Jessica Wild representing the Anthem appellees. The appellants have made a strong case. They've tried to persuade the district court. They've tried to persuade the reviewing physicians below that SO's care was medically necessary. But the evidence strongly supports Anthem's denial of benefits in this case. There are multiple ways to treat mental behavioral health, and residential treatment center is one of those. It was the decision of the appellants, the parents of this girl, and they're treating physicians in California to have her come to Utah and receive care for 10 months at this residential treatment center. It provides housing. It provides school. It provides therapy, meals. As soon as they had the SO go to this residential treatment center, there was a request for certification that was made, and two reviewing psychiatrists reviewed this under the applicable criteria and determined that it was not medically necessary. Now, they did not examine the patient in any way. All they had was prior reports, right? The very first psychiatrist that reviewed this called Sarah Engler. She is the social worker that was treating this girl. And so it was based on his discussion with her and the medical note. But my question was, they did not examine the young lady themselves? No, they did not. Appellants were informed of this decision seven days after she was there. Then three days later, they were also informed that another psychiatrist, Dr. Bussell, she also reviewed the case, and she also found that this was not medically necessary under the criteria. But despite that decision and despite the fact that both of these psychiatrists had recommended outpatient services, they decided to keep her there for 10 months. Does the record show who the two psychiatrists were employed by? Were they employed by the insurance company? They are employed. Or is it in the record? I mean, if it's not in the record, don't tell me. I don't think it's in the record. All right. I don't need to know. Okay. The criteria is in our briefs, and I don't want to go over all of that, but I just would point to it. And do we have the plan? We do have the plan. What document do you say is the plan? Let me address this point. When we were gathering all the papers that are part of the administrative record, there is some language in this combined evidence of disclosure, evidence of coverage and disclosure form, that would lead you to think that there's a separate plan. It is a little sloppy. It says that this is a summary of the important terms of your health plan. Even though it's a summary, it's a huge document. It would make you think that there is a separate plan. But I have confirmed with Anthem that this is the plan. And not only have I confirmed that with them, the group benefit agreement that's between the employer here and Anthem, there's a section in there that says that the combined evidence of coverage and disclosure form is exactly what describes the benefits to which the subscriber and the family are entitled. And so does this, what's the name of the document that you're saying is the plan, does it satisfy all the ERISA requirements for being a plan? I believe so. You believe. Do you know? ERISA requires a lot, and I'm a little bit hesitant to have a definitive yes, but I believe so. Things like a procedure for establishing and carrying out a funding policy and method, a procedure for allocation of responsibilities for the operation and administration of the plan, a procedure for amending the plan and for identifying the persons who have authority to amend the plan, a specific basis on which payments are made to and from the plan. I don't know. That's all in the statute, 29 U.S.C. section 1102 A1 and B. I believe so, but I don't know and I don't want to give a definitive answer. When you look at that list of things and you look at what you're calling the plan, those things are not in this alleged plan. Where does that leave us if we don't have the governing document? Well, I think that this is the analysis that I think Your Honor should take. The question that is asked is what is the standard of review? So we need to see whether this plan has the discretionary authority, and I'm calling it the plan, and it does. There are several sections in there that are under the plain meaning of the language in this document. It says we will determine if the services are medically necessary. It's in several provisions. Well, isn't counsel right? If that's all you need to do is say we will determine, isn't that what insurance companies do? We will determine if we will pay your claim. Yay. Yes, of course. Sure. That's what you do. Is that a statement of scope of review for us? I think it is. And under the very liberal standard within the Tenth Circuit, I think that this passes muster. And it doesn't just say we will determine if this is medically necessary. It's detailed. There's a utilization review section that says that we will determine not only just for any treatment, but for residential treatment center stays. We will determine if appropriate the length of the stay for services. It says that we will determine the time period. We will also let you know when it's no longer medically necessary. So there is language in there that I think is quite detailed that sets forth a very clear understanding that Anthem is going to be the one deciding whether someone like SO can go to a residential treatment center. But it also, counsel, reflects the understanding of companies that by the discretionary authority, that that entitles them to a lesser or would eliminate a lesser determination of scrutiny in regards to this. In other words, if there's a conflict of interest, for example, it clearly is going to be looked at, you know, in one way. And you're not entitled to as much deference. And so what I'm concerned about without documents that we've got, when it says we'll do this and we'll do that, yes, it complies with the language to give them a standard of review that benefits them rather than where it's a de novo review. Am I not right there? And that's what I'm concerned about without me being able to see the documents. And you say this is the document. There is no other document. But yet the names are very similar. So that raises kind of a red flag for me as to what's going on here. And I'm sorry, Your Honor, when you said the names are similar, can you be more specific? Well, let's see. Let me flip back here. It's Anthem Blue Cross Life and Health Insurance and Anthem UM Services, Inc. Sure. Now, that's pretty similar, isn't it? Yes, and you're correct, Your Honor. I would just, I'd like to point to the three decisions I think can answer this. It's the Nance decision, it's the McGraw decision, and it's the Eugene case. Their language in those cases are, I think, far less clear that this is going to be the plan administrator making the decision. In Nance, the language was proof satisfactory to Sun Life. In Eugene, that's the most recent case. There was very similar language where Horizon was given the authority to determine whether services were medically necessary. In all those cases, the court has held that those are sufficient. So I am... Well, I'm not suggesting that the language isn't suspicious. I'm just going back what I was visiting with your opposing counsel about documentation as to where I am with that and what took me back kind of by surprise in looking at this case, and that that's what raises a red flag for me. And the red flag may disappear when we get into it. Sure. May I address the reviews that took place here? I've highlighted that there was the request for certification. There was also an appeal here, and there was another psychiatrist, Dr. Mays, that reviewed this. He looked through the medical notes, and he saw that even after she had been at the New Haven facility for a few months, that there was still no evidence of any suicidal ideation. She was not exhibiting any aggressive or threatening behavior. There was even, as part of the review, showing that there was an outpatient service that was available within 30 miles of the zip code of her hometown. So there was a lot that was evaluated, but the bottom line is, in order to warrant such a high level of supervision and care, there has to be a real showing that it's necessary, and that is built into the medical necessity criteria. Do we have all of that documented? Yes, Your Honor. Do we? Yes. The table of contents indicates there's 46 pages. The record that we have indicates there's only 8 pages. See what I'm saying? The table of contents says there's 46 pages. We have 8 pages. I'm not sure which 46 pages, because the plan is much longer than 46 pages. This is the behavioral health medical necessity criteria. Well, the behavioral health medical necessity criteria is probably the 8 pages, and I have it in front of me. So the table of contents that would indicate it's longer than 8 pages, we should just not worry about that? I didn't draft the table of contents. I think that would be a misstatement. It's only 8 pages. The behavioral health medical necessity criteria contains some background on the medical necessity criteria, but the last two pages are specific to a residential treatment center. There's no evidence in the record of the acute inpatient criteria that appellants have said we confused. And I think that's indicative of the fact that we didn't rely on it, because if we had relied on it, it would have been in this record, but it's not. There might be some overlap of this criteria, but in order to see whether the covered individual is manifesting symptoms and behaviors that represent a deterioration, and that there is self-injurious or risk-taking behaviors that warrant 24-hour care, the reviewers have found that they should look to suicidal ideation. That's something that they review. In every single one of the letters, in every single one of the reviews, the psychiatrist says that they rely on the residential treatment center criteria. So I think this argument that they're looking at the wrong criteria, it's just speculative. There's really nothing to support it. Well, now, looking at it, the initial denial and subsequent denials, you state that SO could be safely treated with outpatient service, but hasn't SO been treated with outpatient services for many years, according to Dr. Woodall and Dr. Maskin, and then inpatient service at the BHC Alhambra Hospital, neither of which improved her condition before she was admitted into the New Haven. So that doesn't jive where you're denying it on one basis, and the record, at least what I'm looking at, indicates that she had been treated for outpatient for several years with the suicide, with everything that you're saying, but then your initial denial says, well, that outpatient service may or may not be helpful, which clearly wasn't helpful. Well, I don't know if it was clearly not helpful, because I think that that's a decision that the psychiatrist would make, but she had been at another residential treatment center that year from January to March, and then she was in the hospital for a little bit. Then she had a short period of outpatient services, but the extent to how much Dr. Woodall was seeing her then or Carol Maskin, we don't know, and the reviewers were recommending an intensive outpatient treatment, and if you look in that same eight-page document what that is, it's a very intense program where you're receiving at least three hours a day of treatment. That's what they were recommending. It was something that was much more all-encompassing and something that the reviewers thought would be appropriate for her. Which they believed she hadn't received, obviously. Correct. Correct. One other point I want to make is the district court found that this denial would have been appropriate under de novo or an arbitrary capricious standard of review, and we make that argument again here. I think the problem in this type of case is that you have parents obviously very concerned for a child, and you have reviewing doctors that would really like to have this patient, this girl, get some help. None of them had the residential treatment center criteria before them, and all these recommendations are, sure, something that they see as being the best thing for her, but that's a very separate question as to whether she qualifies under the plan. Thank you. Thank you. We're out of time. To address your question, Judge Briscoe, I think that if you line up the language of the criteria that you have in front of you and compare it to the language of the denial letters, you'll find a significant discrepancy between the two And that's core and key, I think, to our position in the case. And finally, Your Honor, I would just say some of these statements are simply conclusions on the part of the Anthem reviewers, such as we believe you can be safely treated in an intensive outpatient basis. When you compare that to the specific information provided from Dr. Woodall and Ms. Maskin and compare the knowledge that they had based on their firsthand experience and their examination compared to the knowledge that a record reviewer had, I think that should be acknowledged as weighing in favor of the patients in this situation. Thank you. Thank you. Thank you both for your arguments this morning. The case is submitted.